UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER J. DEARBORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-0078-DFH-WTL |
| | ) | |
| EVERETT J. PRESCOTT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

In this diversity jurisdiction case, defendant Everett J. Prescott, Inc. ("EJP")
has moved for a preliminary injunction to prevent a former sales representative,
plaintiff Christopher Dearborn, from working for a competitor in the central
Indiana sales territory where Dearborn formerly worked for EJP.  The court heard
evidence and argument on April 20, 2007, and now states its findings of fact and
conclusions of law as required by Rules 52 and 65 of the Federal Rules of Civil
Procedure.  Substance shall govern whether a particular item is treated as a
finding of fact or a conclusion of law.  As explained below, EJP's motion for a
preliminary injunction is denied.

A party seeking a preliminary injunction must first show that it has a
reasonable likelihood of success on the merits, that it has no adequate remedy at
law, and that it will suffer irreparable harm if preliminary relief is denied.

*Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party satisfies those requirements, the court must then consider the balance of harms to the parties that would result from an erroneous grant or denial of preliminary relief, as well as the public interest, meaning the consequences of the decision for non-parties. *Promatek Industries*, 300 F.3d at 811; *Abbott Laboratories*, 971 F.2d at 11-12. In this case, the decisive step is the first one. EJP has not shown a reasonable likelihood of success on the merits. Indiana's choice of law rules apply to this case. Indiana courts would apply Indiana substantive law and hold the non-competition covenant to be unenforceable. The Indiana courts would decline to apply the choice of Maine law in the contract itself as contrary to an important Indiana public policy governing covenants not to compete.

I.      *Dearborn's Employment and Resignation*

Plaintiff Christopher J. Dearborn is a citizen of Indiana who lives in Indianapolis. Defendant Everett J. Prescott, Inc. is a Maine corporation with its principal place of business in Maine. Dearborn filed this action on January 22, 2007 seeking declaratory and injunctive relief barring EJP from enforcing a three-year non-competition agreement, as well as damages for alleged breaches of contract. The matter in controversy exceeds $75,000. The court has jurisdiction pursuant to 28 U.S.C. § 1332.

EJP sells and distributes water, sewer, and drain pipe, as well as valves, fittings, fire hydrants, pumps, and related equipment.  Its principal customers are municipal and private water and sewer systems, and contractors who build water, sewer, and drain systems in public and private construction projects.  EJP is based in Gardiner, Maine.  It has a total of 32 offices and distribution centers in a total of nine states, six in New England, plus New York, Ohio, and Indiana.  In Indiana, EJP has offices in Indianapolis, Fort Wayne, Mishawaka, Lafayette, and Jeffersonville.

EJP employed plaintiff Dearborn for approximately ten years in several sales and management positions, all in Indiana.  He began his employment in Mishawaka where he was a sales representative and branch manager for several years.  In early 2003, Dearborn moved to Indianapolis and became the sales manager for all of Indiana.  At the end of 2003, he became an outside sales representative with the title of marketing representative in the Indianapolis office. His compensation in that position was significantly higher than in his position as sales manager for Indiana.  As marketing representative in Indianapolis, Dearborn's territory included Marion and Hamilton Counties, and surrounding areas reaching the cities of Anderson, Tipton, Lebanon, and Plainfield.

During his work in the Indianapolis office, Dearborn was successful.  In 2003, before he took over his assigned territory, EJP's gross sales had been roughly $2 million.  In 2004, Dearborn increased the gross sales for the territory

to $4.2 million, and in 2005, he increased the gross sales further to $7.5 million. Sales in 2006 were also high, though the details are not in the record.  Dearborn's compensation increased with his sales, but not to the extent he expected or thought he deserved.  EJP also introduced some new features to its commission system, that penalized or "fined" Dearborn for matters that he thought had nothing to do with profitability or his deserved compensation.  When he raised his concerns, he was not satisfied with the responses from management.  By the autumn of 2006, he was ripe for recruitment by a competitor.  He was contacted by Ferguson Enterprises, Inc., which also distributes water, sewer, and drain pipe, and valves, fittings, fire hydrants, pumps, and related equipment.  Ferguson competes with EJP in some geographic areas, now including Indiana, where Ferguson opened an office in January 2007.

On January 29, 2007, Dearborn resigned from his position with EJP.  He began working as a sales representative for Ferguson in the Indianapolis area. The parties have stipulated that "Dearborn is employed with Ferguson in a sales capacity substantially similar to the role he held at EJP in the years immediately preceding his resignation from EJP." Ex. 36, ¶ 12.  Dearborn's sales territory for Ferguson includes all or part of his territory with EJP. *Id.*, ¶13.  After leaving EJP, Dearborn has contacted at least four potential customers that have been customers of EJP.  *Id.*, ¶ 15.

II.    *The Non-Competition Agreement*

Prior to 2005, Dearborn had not been subject to any non-competition agreement with EJP.  In 2003 and 2004, however, competitors hired away several EJP sales representatives and managers.  In October 2004, Dearborn himself had been offered a job by a different competitor.  Dearborn discussed the offer with managers, including EJP president Steven E. Prescott.  Prescott raised Dearborn's base compensation $10,000, and Dearborn stayed with EJP.  At that same time in late 2004, Prescott was in the process of deciding to require all EJP sales representatives and managers to sign non-competition agreements.  Agreements were drafted for all sales representatives and managers.  All agreements were identical in form and scope, regardless of the employee's duties and regardless of where the employee worked.  All provided they would be governed by Maine law.  All provided a token payment of $250 to the employee for signing.  EJP officials distributed the agreements to managers at a meeting in Maine in March 2005 and directed them to have other managers and sales representatives sign the agreements.

EJP's Indianapolis manager Jeff Bricker attended the meeting in March 2005.  When he returned to Indianapolis, he met with his staff, including Dearborn.  The evidence supports the inference that Dearborn and others were required to sign the agreements as a condition of remaining employed with EJP.  Dearborn signed the agreement the same day it was presented to him, on March 14, 2005 (though the handwritten date erroneously states 2004).

The agreement is titled "Non-Competition and Non-Disclosure Agreement." The Agreement provides that its term is "the entire time that Employee is employed by Company [EJP] and three (3) years after the termination of employment of Employee for any reason with or without cause." ¶ 1.4. The "Covered Geographic Area" is defined broadly in terms of EJP's entire business: "the marketing and sales areas where Company offers services at the time it seeks to enforce the terms of this Agreement, which includes as of the date of this Agreement the geographical area within a one hundred (100) mile radius of each of the offices, distribution centers, and any other place of business of the Company."

Three key covenants are in dispute here.  First is the covenant not to compete in Paragraph 2.1:

> Employee will not during the term of this Agreement, directly or indirectly, personally or as a principal, agent, stockholder, director, officer, investor, employee, consultant or counselor or in any capacity in or on behalf of any entity whatsoever, corporate, individual or otherwise, provide or offer to provide services competitive with or similar to those provided by Employer in the Covered Geographic Area. . . .

Second is the covenant not to disclose in Paragraph 2.2:

> Employee understands and agrees that all Proprietary Information and Confidential Information is the property of Company, is valuable to Company, and that Employee has no property interest in it.  Employee agrees that both during the term of this Agreement and at all times thereafter, Employee will not, without prior written authorization from Company:  (i) disclose, permit access to, publish or otherwise make available any Proprietary Information or Confidential Information to any person or entity; or (ii) use any Proprietary Information or Confidential

Information for any purpose other than as required to perform Employee's duties to Company.

Third is the covenant not to solicit in Paragraph 2.3:

Employee will not during the term of this Agreement, directly or indirectly, personally or as a principal, agent, stockholder, director, officer, investor, employee, consultant or counselor or in any other capacity in or on behalf of any entity whatsoever, corporate, individual or otherwise:

(a)     Solicit any officer or employee of Company to leave the employ of Company or to enter into direct or indirect competition with Company;

(b)     Employ or offer to employ any officer or employee of Company;

(c)     Solicit or accept business from any referral source that had a business relationship with Company at any time during Employee's employment with Company; or

(d)     Solicit or accept business from any person or entity that was a customer or a known prospective customer of Company at any time during Employee's employment with Company, whether or not Employee had a relationship with that customer while employed by Company.

Another key document is the cease-and-desist letter that EJP's attorney sent to Dearborn's attorney on February 9, 2007. The terms of the letter are relevant because EJP argues that Maine law should govern the agreement, as the Agreement itself provides. ¶ 4.6. Under Maine law, whether a non-competition covenant is enforceable depends not on the covenant as written, but on the extent to which the employer seeks to enforce it. See *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 190 (D. Me. 2005) (enforcing identical agreement to extent that EJP demanded it be enforced), following *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995).

EJP's demand letter did not demand that Dearborn comply with the full scope of the covenants, which are so broad that they reach any area where EJP does business and any EJP customer anywhere.  The letter instead made the narrower demand that Dearborn immediately

> cease and desist from (1) soliciting or accepting business from any person or entity that was a customer or known prospective customer Mr. Dearborn had a relationship with while employed by EJP, (2) working for Ferguson in the territory he covered for EJP at the time he resigned (including specifically, Marion and Hamilton Counties in Indiana and the surrounding areas reaching and including Anderson, Tipton, Lebanon and Plainfield), or (3) disclosing or using any of EJP's Proprietary Information or Confidential Information and trade secrets in violation of the Agreement and/or the Uniform Trade Secrets Act.

Ex. 8 at 2.  Dearborn has not agreed to the demand.

III.   *Enforceability of the Covenants Not to Compete and Solicit*

The parties agree that Dearborn's work at Ferguson violates the terms of the broad covenant not to compete and covenant not to solicit EJP customers as drafted in the Agreement.  Also, it is clear that Dearborn's work at Ferguson fails to comply with EJP's demand letter that focuses on Dearborn's own territory and the customers he worked with for EJP.  On those covenants, the critical issue is whether they are enforceable.  (The covenant not to disclose is discussed separately in Part IV.)

EJP argues that Maine law governs the issue, and that under Maine law, EJP would be entitled to enforce the narrower terms of the demand letter,

regardless of whether the much broader terms of the original agreement were enforceable as written.  Dearborn contends that Indiana law applies and that under Indiana law, unreasonable covenants cannot be enforced even if the employer seeks to enforce only a narrower, more reasonable restriction.

A.   *The Genuine Conflict Between Maine and Indiana Law*

To determine whether the covenants are enforceable, the court must first determine whether Maine and Indiana law are actually in conflict.  See *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 605 n.2 (7th Cir. 1981); *Allen v. Great American Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002).  As explained in detail here, Maine law would allow enforcement of those broad covenants to the limited extent that EJP seeks to enforce them.  Indiana law does not allow enforcement of such broad covenants as written.  Under Indiana law, an employer cannot save such overly broad covenants by retreating from the broad language in court and asking the court to enforce them only to a narrower degree. Because there is a genuine conflict between Maine law and Indiana law, the decisive issue then becomes which law should be applied.

At a high level of generality,  Maine law and Indiana law on non-competition covenants are similar, but important differences appear quickly with more detailed scrutiny.  In general, both Maine law and Indiana law treat agreements not to compete as agreements that are in restraint of trade and contrary to public policy. See *Chapman & Drake v. Harrington*, 545 A.2d  645, 647 (Me. 1988); *Lord v. Lord*,

454 A.2d 830, 834 (Me. 1983); *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005); *Licocci v. Cardinal Associates, Inc.*, 445 N.E.2d 556, 561 (Ind. 1983).  Both states recognize that such restraints may be valid if they serve legitimate interests and are reasonable in terms of time, geography, and scope of activity.  *E.g.*, *Chapman & Drake*, 545 A.2d at 647; *Licocci*, 445 N.E.2d at 561.[1]  The two states diverge sharply, however, where an employer has drafted covenants that are far too broad to be enforceable as written.

### 1.  *Indiana Law on Overly Broad Covenants*

Under Indiana law, the EJP covenant not to compete and covenant not to solicit customers are clearly unreasonable as applied to plaintiff Dearborn.  The geographic covenant not to compete by its terms would bar Dearborn from working for a competitor within 100 miles of any EJP office or facility, from Indiana all the way to Maine.  Similarly, the covenant not to solicit by its terms would bar Dearborn from soliciting or accepting business from any "customer or known prospective customer" of EJP, regardless of whether Dearborn himself had any relationship with the customer or prospective customer.

---

[1]Indiana law also clearly differentiates between covenants not to compete that are ancillary to a sale of a business and those that are part of an employment relationship.  Employment contracts are reviewed more skeptically and critically, primarily because of the difference in bargaining power and the usual ability of a seller of a business to support himself or herself in other ways with the proceeds of the sale.  *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005), quoting *Alexander & Alexander, Inc. v. Danahy*, 488 N.E.2d 22, 28 (Mass. App. 1986).  Reported case law on this point is scarce under Maine law and appears not to differentiate (at least not yet) between the two situations.

Under Indiana law, in the absence of genuine trade secrets that would be useful far beyond the scope of the employee's own responsibilities, geographic and customer restrictions on a departing salesman must ordinarily be no broader than the scope of the employee's former responsibilities.  *E.g.*, *Donahue v. Permacel Tape Corp.*, 127 N.E.2d 235, 241 (Ind. 1955); *Vukovich v. Coleman*, 789 N.E.2d 520, 525 (Ind. App. 2003); *Medical Specialists v. Sleweon*, 652 N.E.2d 517, 523-24 (Ind. App. 1995); *Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1096-97 (N.D. Ind. 1998); *Norlund v. Faust*, 675 N.E.2d 1142, 1155 (Ind. App. 1997) ("The use of territorial boundaries is only one method of limiting a covenant's scope, and when a covenant not to compete contains a restraint which clearly defines a class of persons with whom contact is prohibited, the need for a geographical restraint is decreased."), citing *Field v. Alexander & Alexander*, 503 N.E.2d 627, 635 (Ind. App. 1987), and *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 213 (Ind. App. 1982); *Commercial Bankers Life Ins. Co. of America v. Smith*, 516 N.E.2d 110, 114 (Ind. App. 1987) (finding a distinction "between the area in which the employee actually works and the area which comprises the full extent of the Company's business").  The limits, whether in terms of geography or customers, must be reasonably congruent with the employer's protectable interest. *Standard Register Co. v. Cleaver*, 30 F. Supp. 2d at 1096 (recognizing employer's legitimate interests with current customers in similar case under Indiana law involving printed business forms and other business specialty printing products); *Smart Corp. v. Grider*, 650 N.E.2d 80, 83 (Ind. App. 1995) ("A covenant not to compete must be sufficiently specific in scope to coincide with only the legitimate interests of the

employer. . . ."), citing *Field*, 503 N.E.2d at 635; *Cohoon v. Financial Plans & Strategies, Inc.*, 760 N.E.2d 190, 195-96 (Ind. App. 2001); *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 93 (Ind. App. 2001).[2]

At the same time, the narrower relief that EJP seeks in court probably would be reasonable under Indiana law because the geographic and customer limits would be tied to Dearborn's own duties.  See, *e.g.*, *4408, Inc. v. Losure*, 373 N.E.2d 899, 902 (Ind. App. 1978).  Under Indiana law, it would have been relatively easy to draft such a narrow and enforceable agreement.

Under Indiana law, however, when an employer drafts an overly broad covenant, the price of over-reaching is that the restriction cannot be enforced at all, even if it would have been possible to draft and enforce a narrower, more reasonable restriction.  See, *e.g.*, *Dicen*, 839 N.E.2d at 689; *Young v. Van Zandt*, 449 N.E.2d 300, 304 (Ind. App. 1983) ("If the covenant is not reasonable as written, the court may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they had not made."), citing *Licocci*, 445 N.E.2d at 561, and *Donahue v. Permacel Tape Corp.*, 127 N.E.2d at 241 (rejecting argument that equities of the case required

---

[2]The general requirement for geographic or customer limits tied to the former employee's own activities may not apply if a broader covenant is necessary to protect the employer's genuine trade secrets.  See *Donahue v. Permacel Tape Corp.*, 127 N.E.2d 235, 239 (Ind. 1955); accord, *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507, 510 (Ind. 1995) (*dicta*).  As discussed below in Part IV, there is no threat of disclosure or use of genuine trade secrets here; EJP's legitimate interests are limited to Dearborn's relationships with customers.

enforcement in area of former employee's actual work; overly broad covenant held unenforceable in its entirety); see also *Product Action International, Inc. v. Mero*, 277 F. Supp. 2d 919, 928-29 (S.D. Ind. 2003) (predicting Indiana Supreme Court would not apply provision in covenant stating that if any part of the covenant were too broad to permit enforcement to its fullest extent, the restriction should be enforced to maximum extent permitted by law and court should have power to modify the covenant to conform it to law).

The two overly broad covenants cannot be saved here by Indiana's "blue pencil" rule.  Under that rule, if a covenant is clearly separated into parts, and if some parts are reasonable and others are not, the contract may be severed or "blue penciled" so that the reasonable portions may be enforced.  *Licocci v. Cardinal Associates*, 445 N.E.2d at 561 ("if the covenant is clearly separated into parts and some parts are reasonable and others are not, the contract may be held divisible"); *Dennis v. Beard*, 6 Ind. 200, 1855 WL 3701, at *2 (1855); *Young v. Van Zandt*, 449 N.E.2d 300, 304 (Ind. App. 1983).  Such efforts to save a covenant are limited to applying terms that already exist in the contract; the court may not add terms.  *Licocci*, 445 N.E.2d at 561; accord, *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 689 (Ind. 2005) (employee's overly broad covenant was void where "blue pencil" technique could not save it); *JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1087 (7th Cir. 1993); *Burk v. Heritage Food Service Equipment, Inc.*, 737 N.E.2d 803, 814-15 (Ind. App. 2000); *Smart Corp. v. Grider*, 650 N.E.2d 80, 83-84 (Ind. App. 1995); *Hahn v. Drees, Perugini & Co.*, 581 N.E.2d 457, 462 (Ind. App. 1991);

*Young v. Van Zandt*, 449 N.E.2d at 304; *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 215 (Ind. App. 1982); *Bennett v. Carmichael Produce Co.*, 115 N.E. 793, 795-96 (Ind. App. 1917) (applying blue-pencil rule); see also *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, 683-84 (S.D. Ind. 1998).  In this case, however, there is no way to save either the covenant not to compete or the covenant not to solicit customers by employing the proverbial blue pencil. The doctrine would allow the court to consider each of the separate paragraphs separately, but there is no severable language that could be stricken in Paragraph 2.1 or Paragraph 2.3(d) that would render either provision reasonable as applied to Dearborn.[3]

### 2.    *Maine Law on Overly Broad Covenants*

Maine takes a very different approach to overly broad covenants not to compete, like the EJP covenants.  The court does not consider the covenant as drafted and agreed by the parties.  Instead, the court considers the scope of the

---

[3]The covenant not to solicit customers has some other problems that would be difficult to overcome.  First, the covenant not to solicit seems to prohibit seeking business from anyone who ever bought any EJP products at any time while Dearborn was employed by EJP.  The evidence shows that EJP lists as "current" customers those who may not have placed any orders for several years. The covenant therefore would reach "customers" with whom EJP would have no legitimate protectable interest.  Second, the covenant not to solicit is not limited to direct competition with EJP's business.  It is written so broadly as to prohibit any sort of business at all with a covered customer.  If Dearborn were trying to sell insurance or long-distance telephone service to those companies, he would be violating the broad covenant not to solicit, which would reach far beyond EJP's legitimate protectable interest.  The court need not dwell on these possibilities, however, for reasons stated in the text.

covenant *only as the employer seeks to enforce it.*   *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995); *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 188, 193 (D. Me. 2005).

This unusual, and perhaps unique, rule appears to have been first stated in Maine in *Chapman & Drake v. Harrington*, 545 A.2d 645 (Me. 1988).  The court wrote:

> Since the reasonableness of the noncompetition agreement depends upon the specific facts of the case, see, *e.g.*, *American Security Services, Inc. v. Vodra*, [222 Neb. 480, 488, 385 N.W.2d 73, 79 (1986)], we assess that agreement only as Chapman & Drake has sought to apply it and not as it might have been enforced on its plain terms.

545 A.2d at 647.  This rule was repeated in *Brignull v. Albert*, 666 A.2d at 84, without further elaboration or explanation.[4]  *Brignull* illustrates the operation of this rule.  The covenant prohibited the former employee from competing with the employer's optometry business for four years within 20 miles of his office.  The employer sought to enforce the covenant only for 16 months as applied to a

---

[4]The *American Security Systems* case from Nebraska cited by the Maine court in *Chapman & Drake* did not state or apply the Maine rule in question here, but indicated only the basic point that reasonableness would depend on the specific facts of the case.  In fact, Nebraska courts have rejected the idea that courts should modify or reform overly broad covenants not to compete.  See *CAE Vanguard, Inc. v. Newman*, 518 N.W.2d 652, 656 (Neb. 1994) (reversing trial court's reformation of unreasonable covenant; stating that it is not the court's function to reform unreasonable covenants, and that a contract provision inviting such reformation may not confer on a court a power it does not possess).

Plaintiffs in *Chapman & Drake v. Harrington* and *Brignull v. Albert* did not seek injunctive relief, but only monetary damages.  See 666 A.2d at 84; 545 A.2d at 647.

location within two miles of his office.  The court found that narrower scope reasonable and did not comments on whether the broader scope would have been reasonable.  666 A.2d at 84.

Thus, under Maine law as stated in *Chapman & Drake* and *Brignull*, the overly broad scope of the EJP covenants does not matter.  What matters is the extent of the relief that EJP seeks in court.  EJP seeks to enforce the covenant not to compete and the covenant not to solicit only in Dearborn's Indianapolis-area sales territory for EJP, and only with EJP customers he dealt with on behalf of EJP.  The testimony from both sides showed that sales representatives in the water, sewer, and drain distribution business develop good working relationships with at least some customers.  The product differentiation in the industry is not high.  The products are not completely generic commodities, but there appears to be vigorous competition among manufacturers and among distributors like EJP and Ferguson.   In such situations, the employer often has an interest in the goodwill with the customer that can be protected by a non-competition covenant. See *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d at 190-91 & n.4 (enforcing identical contract under Maine law, as applied to the covenant not to solicit; EJP had waived reliance on the geographic covenant not to compete); *Chapman & Drake*, 545 A.2d at 647 (employee had substantial contact with customers and was in position to take advantage of employer's good will).  Accordingly, the relief that EJP seeks would be reasonable under Maine law.

B.    *The Choice of Law – Public Policy Considerations*

Because there is a genuine conflict between Maine law and Indiana law as applied to this case, the decisive issue becomes the choice of law.   Dearborn argues that Indiana courts would apply Indiana law because application of Maine law would conflict with Indiana's public policy on covenants not to compete.

When exercising diversity jurisdiction, this court applies Indiana's choice of law principles.   See *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *Griffin v. McCoach*, 313 U.S. 498, 506 (1941) (forum state's choice of law principles governed whether public policy barred enforcement of contract); *Sound of Music Co. v. Minnesota Mining & Mfg. Co.*, 477 F.3d 910, 915 (7th Cir. 2007).

Indiana law generally enforces contractual provisions that specify a choice of law, at least in commercial and other settings (unlike this case) where the parties have comparable bargaining power, and where the chosen state has some connection to the parties' relationship.   See *Allen v. Great American Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) (insurance company and its agents); *Homer v. Guzulaitis*, 567 N.E.2d 153, 156 (Ind. App. 1991) (vendor and purchaser of real estate); *Hoehn v. Hoehn*, 716 N.E.2d 479, 484 (Ind. App. 1999) (spouses' agreement to modify spousal support obligation); *St. Paul Travelers Cos. v. Corn Island Shipyard, Inc.*, 437 F. Supp. 2d 837, 845 (S.D. Ind. 2006) (applying choice of New York law in commercial insurance contract).

But Indiana will not enforce a contractual provision, including a choice of law provision, if enforcement would be contrary to Indiana's public policy. *E.g.*, *Schaffert v. Jackson Nat'l Life Ins. Co.*, 687 N.E.2d 230, 234 (Ind. App. 1997) (applying Illinois law as to whether life insurance contract had taken effect before accidental death), quoting *Wabash R. Co. v. Hassett*, 83 N.E. 705, 709 (Ind. 1908); accord, *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 132 (7th Cir. 1990) (holding that Indiana franchisee could not waive Indiana statutory rights by agreeing in contract to apply New York law). Another state's law is not contrary to Indiana public policy merely because the result would be different. *Corn Island Shipyard*, 437 F. Supp. 2d at 845; accord, *Maroon v. State*, 411 N.E.2d 404, 411 (Ind. App. 1980) (applying Illinois rather than Indiana law to remedy available to victim of escaped state mental patient). The *Maroon* court quoted one of the more eloquent statements of this principle:

> Our own scheme of legislation may be different. We may even have no legislation on the subject. That is not enough to show that public policy forbids us to enforce the foreign right. A right of action is property. If a foreign statute gives the right, the mere fact that we do not give a like right is no reason for refusing to help the plaintiff in getting what belongs to him. We are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home.

*Loucks v. Standard Oil Co. of New York*, 120 N.E. 198, 201 (N.Y. 1918) (Cardozo, J.).

Indiana law on the public policy exception to choice of law provisions in contracts appears to be consistent with the more detailed guidance available from Section 187 of the Restatement (Second) of Conflicts of Law, which states in full:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>> (b) *application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.*
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Comment g to Section 187 addresses the public policy exception in more detail.  The comment states in relevant part:

> Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interest and for state regulation.  The chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice by the parties. The forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law.  Application of the chosen law will be refused only (1) to protect a fundamental policy of the state which, under the rule of § 188, would be the state of the otherwise applicable law, provided (2) that this state has a materially greater interest than the state of the chosen law in the determination of the particular issue.

\*   \*   \*

To be "fundamental," a policy must in any event be a substantial one. Except perhaps in the case of contracts relating to wills, a policy of this sort will rarely be found in a requirement, such as the statute of frauds, that relates to formalities (see Illustration 6). Nor is such policy likely to be represented by a rule tending to become obsolete, such as a rule concerned with the capacity of married women (see Illustration 7), or by general rules of contract law, such as those concerned with the need for consideration (see Illustration 8). *On the other hand, a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power.* Statutes involving the rights of an individual insured as against an insurance company are an example of this sort (see §§ 192-193).

Judge Sharp relied on Indiana public policy to reject a choice-of-law provision in a covenant not to compete in *South Bend Consumers Club v. United Consumers Club*, 572 F. Supp. 209 (N.D. Ind. 1983). The agreement in question gave an Indiana citizen an exclusive franchise territory in Indiana and Michigan around South Bend, Indiana. The agreement included a covenant not to compete after termination that was overly broad in scope. 572 F. Supp. at 214. The agreement provided that Illinois law would govern, but Judge Sharp applied Section 187(2)(b) of the Restatement (Second) of Conflicts of Law to hold that Indiana law would apply, rendering the overly broad covenant unenforceable: "Since the preferred policy of this state is unalterably opposed to the enforcement of this covenant in any degree or manner, Restatement 187(2)(b) would apply and, consequently, this cause will be governed by Indiana law." *Id.* at 214 (footnote omitted). Judge Sharp did not decide definitively that the result would have been different under Illinois law, but he based the choice of law on the ground that Illinois courts appeared to be more willing than Indiana courts to enforce such covenants. *Id.* at 214 n.2.

The Seventh Circuit cited this holding with approval in *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 133 n.1 (7th Cir. 1990).  The parties in *Wright-Moore* had agreed to the terms of an Indiana franchise for distribution of copiers and related products.  The contract provided that New York law would apply, which would have prevented application of Indiana statutes providing that certain terms of franchise agreements are not enforceable.  The Seventh Circuit held that Indiana public policy required rejection of the choice-of-law provision:

> The public policy, articulated in the nonwaiver provisions of the statute is clear:  a franchisor, through its superior bargaining power, should not be permitted to force the franchisee to waive the legislatively provided protections, whether directly through waiver provisions or indirectly through choice of law.  This public policy is sufficient to render the choice to opt out of Indiana's franchise law one that cannot be made by agreement.

908 F.2d at 132.  Because Indiana had a materially greater interest in the dispute than New York, and because application of New York law would be contrary to "a fundamental Indiana policy," Indiana franchise law governed.  *Id.* at 133.  In a supporting footnote, the Seventh Circuit noted its decision was similar to *South Bend Consumers Club*, where Indiana's public policy precluded the parties' choice of Illinois law governing a covenant not to compete.  *Id.* at 133 n.1.

The Indiana Supreme Court has provided more detailed guidance in deciding whether a wide variety of contract terms should be deemed unenforceable as contrary to Indiana public policy.  There often will be no significant difference between a substantive contract provision that is contrary to Indiana public policy

and a choice of law provision that can be used to try to evade the same Indiana public policy.

When Indiana courts consider arguments that a contract is contrary to public policy, the public policy they consider is not limited to what is stated in statutes. They consider "the surrounding circumstances of a given case," and if the public policy is not explicit, they consider "the overall implications of constitutional and statutory enactments, practices of officials and judicial decisions to disclose the public policy of this State." *Straub v. B.M.T.*, 645 N.E.2d 597, 599 (Ind. 1994). The Indiana courts are also cautious in such cases. They must "always weigh in the balance the parties' freedom to contract." *Allstate Ins. Co. v. Boles*, 481 N.E.2d 1096, 1101 (Ind. 1985). The Indiana courts recognize that the power of courts to declare a contract void under public policy is "a very delicate and undefined power," requiring caution against its "reckless use." *Straub*, 645 N.E.2d at 599 n.3. Indiana courts look for a clear manifestation of public policy, a tendency to injure the public, or contracts "against the public good" or "inconsistent with sound policy and good morals." *Id.* at 599.

The Indiana Supreme Court has identified the following factors it considers in cases challenging a contract or contract provision on public policy grounds when there is not a statutory prohibition or tendency to injure the public:

> In determining whether a contract not prohibited by statute nor which tends to injure the public contravenes public policy, we look at five factors: (1) the nature of the subject matter of the contract; (2) the strength of the

public policy underlying any relevant statute; (3) the likelihood that refusal
to enforce the bargain or term will further any such policy; (4) how serious
or deserved would be the forfeiture suffered by the party attempting to
enforce the bargain; and (5) the parties' relative bargaining power and
freedom to contract.

*Trimble v. Ameritech Publishing, Inc.*, 700 N.E.2d 1128, 1129 -30 (Ind. 1998)

(clause limiting damages for errors in telephone directory was not contrary to

public policy), citing *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1130 (Ind. 1995)

(commercial lease provision shifting responsibility for sprinkler systems from

owner to tenant was not contrary to public policy, at least in commercial

transaction where parties had equal bargaining power).  Although this case also

involves broad statutory prohibitions, these factors help guide the court's analysis

of the public policy issue.  The factors indicate that the Indiana courts would

decline to enforce the choice of law provision in EJP's covenants not to compete

and not to solicit.


1.     *Subject Matter of the Contract*

The subject matter of the EJP Agreement weighs in favor of the public policy

exception here.  The central subject matter of the agreement is the restraint of

trade.  Indiana public policy starts from the premise that such agreements  are

generally contrary to public policy.  Indiana statutes provide that it is a crime to

enter into a contract imposing an unreasonable restraint of trade and that such

contracts are "against public policy, unlawful, and void."  Ind. Code §§ 24-1-1-1

and 24-1-2-1.  Indiana law in this area can and often does override the ability and

freedom of parties to decide the terms of their own contracts, especially in the context of employment contracts.  The whole point of the Indiana decisions in this area is that the courts will not, because of Indiana's public policy, enforce terms of contracts to which the parties have agreed.  The Indiana Supreme Court stated the point powerfully more than fifty years ago:  "We are here concerned with one of the most basic rights of man as recognized by our Judean-Anglican civilization, 'that man is endowed by his Creator with the right to life, liberty and the pursuit of happiness.'  We perceive that these rights are inherent and therefore inalienable – whether on the part of governments or by man individually through his own act."   *Donahue v. Permacel Tape Corp.*, 127 N.E.2d at 240, citing both the Declaration of Independence and Article I, Section 1 of the Indiana Constitution.

### 2.   *Strength of the Public Policy*

Second, the public policy at issue here is strong.  The specific issue in this case – the consequences of an employer's overly broad restrictions in a covenant not to compete – is a strong and fundamental feature of the public policy reflected in those many reported decisions.  Indiana courts have repeatedly required that covenants not to compete be sufficiently specific in scope to allow the employee "a clear understanding of what conduct is prohibited."   *Cohoon v. Financial Plans & Strategies, Inc.*, 760 N.E.2d 190, 195 (Ind. App. 2001); *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 93 (Ind. App. 2001); *Smart Corp. v. Grider*, 650 N.E.2d 80, 83 (Ind. App. 1995); *Field v. Alexander & Alexander of Indiana*, 503 N.E.2d 627, 635 (Ind. App. 1987); see also *Product Action International, Inc. v. Mero*, 277 F. Supp.

2d 919, 927-32 (S.D. Ind. 2003) (predicting that Indiana courts would not accept contractual invitation to narrow an overly broad contract that said it should be "enforced to the maximum extent permitted by law").

The important purposes of this well established policy are evident.  First, it prevents Indiana courts from making contracts for the parties.  More important, this policy gives an unhappy and restless employee an opportunity to know the terms that actually bind him.  He is not required to leave the old employer and burn his bridges, and only then find out whether he can take his new job.  Under the Indiana approach, the departing employee has at least an opportunity to seek meaningful legal advice about the scope and enforceability of the contract.  The strict Indiana approach to overly broad covenants thus helps to protect employees from the intimidating, *in terrorem* effects of such covenants.[5]

---

[5]Other courts have described persuasively these effects and the dangers to employees.  *E.g.*, *Valley Medical Specialists v. Farber*, 982 P.2d 1277, 1286 (Ariz. 1999) ("For every agreement that makes its way to court, many more do not. Thus, the words of the covenant have an *in terrorem* effect on departing employees. Employers may therefore create ominous covenants, knowing that if the words are challenged, courts will modify the agreement to make it enforceable.  Although we will tolerate ignoring severable portions of a covenant to make it more reasonable, we will not permit courts to add terms or rewrite provisions.") (internal citations omitted); *Kolani v. Gluska*, 75 Cal. Rptr. 2d 257, 260 (Cal. App. 1998) (narrowing an overly broad covenant to save it would be contrary to state public policy: "Employers could insert broad, facially illegal covenants not to compete in their employment contracts.  Many, perhaps most, employees would honor these clauses without consulting counsel or challenging the clause in court, thus directly undermining the statutory policy favoring competition.  Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a narrow, lawful construction in the event of litigation."); *Reddy v. Community Health Foundation of Man*, 298 S.E.2d 906, 916 (W. Va. 1982) ("where savage covenants are included in employment contracts so that their overbreadth operates, by *in terrorem* effect, to subjugate employees unaware of the tentative

If the court were to apply Maine law to this case, the court would have to disregard this important public policy of Indiana.  The restless or departing employee could have no "clear understanding of what conduct is prohibited."  He could not secure meaningful legal advice because he could not know what the employer might want to enforce.  He could not ask the employer to decide without effectively burning bridges with the employer.  And the Maine approach puts the court squarely in the position of having to write the contract for the parties.

EJP points out that Dearborn is not relying on Indiana statutes.  He has not done so directly, though Indiana Code §§ 24-1-1-1 and 24-1-2-1 clearly establish a public policy against contracts that unreasonably restrain trade.  The details of Indiana's public policy in this field have been worked out through case law rather than through more detailed statutes.  The court does not believe that makes a

---

nature of such a covenant, we will find the covenant void"); *Richard P. Rita Personnel Services Intern., Inc. v. Kot*, 191 S.E.2d 79, 81 (Ga. 1972), citing Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 682-83 (1960) ("For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly [sic] relations with their competitors.  Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction. If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. This smacks of having one's employee's cake, and eating it too."); *House of Vision, Inc. v. Hiyane*, 225 N.E.2d 21, 25 (Ill. 1967) ("To stake out unrealistic boundaries in time and space, as the employer did in this case, is to impose upon an employee the risk of proceeding at his peril, or the burden of expensive litigation to ascertain the scope of his obligation.").

difference here.  For reasons explained above, the Indiana public policy, reflected in numerous appellate decisions, holding that overly broad covenants not to compete are not enforceable, fits to a tee both portions of the italicized sentence from comment g of Restatement (Second) § 187.  The contracts are illegal and void under Indiana law, and that law is designed to protect employees against the oppressive use of superior bargaining power.  Indiana courts can rely on court decisions to reflect public policy.  See *Straub*, 645 N.E.2d at 599.  That reliance is appropriate in this field, where the Indiana legislature has thus far been content to rely on the courts to develop the details.  Since *Donahue v. Permacel Tape* was decided in 1955 and stated for the modern era the policy against re-writing overly broad covenants, many reported Indiana appellate opinions have dealt with such covenants.  The Indiana legislature has not seen fit to modify by statute this strong and often-repeated policy.

### 3.    *Furtherance of the Public Policy*

On the third *Trimble* factor relevant to the public policy decision, it is highly likely that refusal to enforce this choice of law on overly broad covenants will further the Indiana public policy.  The public policy addresses deliberate choices by employers, always made upon the advice of counsel.  Decisions in this and similar cases refusing to allow evasion of an important Indiana public policy by using choice-of-law provisions in contracts should send the clear message to employers.  If employers feel they need enforceable covenants, they must write them carefully, specifically, and narrowly.  An employer may not deliberately

choose to write overly broad covenants that have intimidating, *in terrorem* effects on employees, and then, when an employee challenges the overly broad covenants in court, back off of those broad provisions in the hope that Indiana courts might bail the employer out by writing a new contract for the parties.

### 4. *Fairness to the Employer*

The refusal to enforce EJP's choice of law provision on public policy grounds will not impose an unfair or undue forfeiture on EJP. EJP imposed this contract as a condition of Dearborn's employment after he had been working there for eight years, and less than two years before he left. EJP has not shown that it acted in detrimental reliance on the covenants in dispute. EJP gave up only the token payment of $250 (and some portions of the Agreement remain valid). The result of a decision declining to enforce the choice of law provision on public policy grounds will leave EJP free to compete with Ferguson and all the other competing distributors.

### 5. *The Parties' Bargaining Power*

The fifth *Trimble* factor, the parties' relative bargaining power, weighs heavily in favor of relying on public policy to refuse enforcement of EJP's choice of law provision. These covenants not to compete were not the product of arms-length bargaining between two parties who were equally free to walk away from the table. Dearborn was an employee at will. The contract specifically provided

that the consideration from EJP included continued employment.  EJP was free to fire him if he did not agree to this modification of the terms of his employment. It probably would have done so, unless many other sales representatives or manager had also resisted the demand.  EJP had made a policy decision to impose uniform contracts on all managers and sales representatives.  There would have been no point in trying to bargain over the scope of the covenants.

Along these lines, the court must address testimony from EJP president Steven Prescott that the new non-competition agreements were good for EJP's employees and showed the company's commitment to their careers.  Perhaps Mr. Prescott honestly believes this, but if so, he has succeeded in deceiving only himself.  The Agreement clearly provides that it is "not a contract of employment and that the employment of Employee is terminable at will."  ¶ 4.1.  "Nothing contained herein shall be deemed to grant to Employee any employment related rights or rights to continued employment."  *Id.*  As compared to Dearborn's and other employees' situations before EJP required them to sign the new agreements, the agreements provided no benefits apart from the token payments of $250 intended to avoid arguments based on lack of consideration.  The agreements certainly do not show anything positive about the company's commitment to its employees' careers.  The agreements would not have prevented EJP from firing someone the next day, subject to the newly minted and overly broad covenants not to compete or solicit.

6.    *Other Matters Affecting the Choice of Law*

On the choice of law issue, Section 187(b) of the Restatement (Second) of Conflicts of Law also requires consideration of whether Indiana has a materially greater interest in the litigation than Maine.   The court finds that it does. Dearborn is an Indiana resident, and his ability to work here in his chosen field is at issue.  Indiana was the center of gravity of his employment relationship with EJP throughout the ten years he worked for EJP.  All his positions were in Indiana.  He visited Maine only occasionally, perhaps only twice.  Apart from a few customers in Michigan, served by the Mishawaka, Indiana office years ago, all the customers and business Dearborn has handled for EJP have been in Indiana. Dearborn's supervisor with EJP is also located in Indiana.  Indiana is the site of the activity that EJP seeks to enjoin.  Indiana cities, towns, water and sewer systems, and Indiana contractors, are the customers who benefit from vigorous competition in this business.   On the other side of the equation, EJP is headquartered in Maine and presumably would benefit there from enforcement of the covenants.   On balance, Indiana has a materially greater interest in this litigation than Maine, so that Indiana courts could and would apply Indiana public policy to bar enforcement of the choice of law provision.

EJP contends that it should be entitled to application of Maine law because of its interest in uniformity among its employees in different states.  EJP suggests that it would be too expensive and too much trouble to prepare different covenants not to compete for each state where it has employees.  Those concerns appear at

first to be reasonable, all other things being equal.  See *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1082 (7th Cir. 1986) (reasonable for employer with "far-flung work force" to have all legal obligations of former employees governed by same law for program of incentive awards tied to condition of non-competition that was not crafted as covenant not to compete and that would not be enforceable by injunctive relief, but only by forfeiture of extra monetary award). But those concerns about convenience and consistency do not justify the double-edged contract that EJP imposed on Dearborn and other employees in Indiana. By choosing to invoke Maine law, EJP tried to pursue a strategy that would allow it the full benefit of the intimidating, *in terrorem* effects of the overly broad covenants, without having to pay the price that Indiana requires of an employer who takes that approach – unenforceable covenants.  Also, it would not have been difficult to draft a contract enforceable under both Indiana and Maine law applying to a sales representative's own sales territory and customers.

Applying the five factors spelled out in *Trimble v. Ameritech Publishing*, 700 N.E.2d at 1129-30, therefore, the court predicts that Indiana courts would find that the choice of Maine law in the EJP Agreement is unenforceable as contrary to Indiana public policy.  This prediction of Indiana law is consistent with Section 187 of the Restatement (Second) of Conflicts of Law, with Judge Sharp's decision in *South Bend Consumers Club*, 572 F. Supp. at 212-14, and with decisions in several other states.  See *Fine v. Property Damage Appraisers, Inc.*, 393 F. Supp. 1304, 1308, 1310-11 (E.D. La. 1975) (rejecting contract's choice of

Texas law for covenant not to compete; public policy required application of Louisiana law to hold that covenant was not enforceable); *Forney Industries, Inc. v. Andre*, 246 F. Supp. 333, 334 (D.N.D. 1965) (rejecting contract's choice of Colorado law; North Dakota public policy reflected in statute required application of North Dakota law to hold that covenant not to compete was not enforceable); *May v. Mulligan*, 36 F. Supp. 596, 598 (W.D. Mich. 1939) (relying on Michigan public policy to refuse to enforce covenant not to compete that otherwise would have been governed by Illinois law).

On the other side of the balance, EJP relies on several cases that honored choice of law provisions in covenants not to compete.  In *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 406-07 (N.D. Ill. 2001), the court applied the Washington law selected in the contract.  It was apparently somewhat easier under Washington law to modify a "fair" but still overly broad covenant. Although there were possibly "slight differences" between Illinois and Washington law, "Washington law is not so repugnant to a strong and fundamental policy of Illinois that the court cannot abide by the parties' contractual choice of law provision."  *Id.* at 407.  The *Labor Ready* court followed a similar decision in *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1335 (N.D. Ill. 1990), which also applied Washington law to a covenant not to compete after finding it was not "repugnant to a strong and fundamental policy of Illinois."

The *Labor Ready* court also relied on the Seventh Circuit's decision in *Vencor, Inc. v. Webb*, 33 F.3d 840, 844-45 (7th Cir. 1994), which affirmed a district court's denial of a preliminary injunction in a covenant not to compete case. In *Vencor*, the Seventh Circuit and district court applied Illinois choice of law principles to accept the parties' choice of Kentucky law rather than Illinois law, but ultimately found the covenant not enforceable. The Seventh Circuit noted "there is a long way between, on the one hand, finding a covenant unenforceable and, on the other, declaring that its enforcement is so odious that a court will not respect the parties' election to be governed by the law of a state that would. We see no reason why an Illinois court would here upset the parties' agreement to be governed by Kentucky law." *Id.* at 845, citing *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1081 (7th Cir. 1986) (applying Illinois choice of law principles to enforce parties' choice of law on contract providing monetary awards to former employees who did not compete; the common law policy was "not of such strength as would override a choice of law provision" under Illinois public policy standard). *Labor Ready*, *Vencor*, and *Sarnoff* are all instructive, but all applied Illinois choice of law principles to the public policy question. This case presents a situation in which there are significant differences between Indiana and Illinois in terms of both substantive law and the public policy choice of law issue. Under Indiana choice of law principles and substantive law, the covenants not to compete and solicit in EJP's agreement with Dearborn are not enforceable.

IV.    *The Covenant Not to Disclose*

EJP's Agreement with Dearborn requires him not to disclose or use the company's proprietary and confidential information.  The Agreement defines those two categories of information very broadly, to include any information about costs, pricing, and customers.  EJP maintains a computerized data base that contains vast quantities of such information about all its products, customers, and suppliers.  Dearborn and other sales representatives had unlimited access to that data base.

EJP does not contend that Dearborn removed any documents, records, or materials when he left EJP.  EJP tried to imply at the hearing that Dearborn might still have a few sales reports or other documents, but there is no evidence to that effect.  There also is no indication that he is actually using any EJP information.

EJP contends that Dearborn's work for Ferguson will inevitably cause him to violate the covenant not to disclose or use proprietary and confidential information.  In cases under trade secret statutes and non-disclosure agreements, former employers frequently resort to an "inevitable disclosure" theory to try to stop former employees from competing when there is no enforceable non-competition covenant.  There is no indication that Maine has adopted this theory, though Indiana has recognized it on extreme facts.  See *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507, 510-11 (Ind. 1995), affirming 634 N.E.2d 778 (Ind. App. 1994) (affirming injunction under trade secret statute against employment with

competitor where former executive had been "harvesting" employer's proprietary information before his departure). The Seventh Circuit has recognized the theory in an Illinois case also presenting rather extreme facts showing bad faith by the departing employees. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir.1995). Even in *PepsiCo*, the Seventh Circuit did not believe the preliminary injunction had to be granted, but it held that the district court did not abuse its discretion in granting it, based on the evidence of bad faith by the departing employee. 54 F.3d at 1271.

The inevitable disclosure theory has been criticized because it can give an employer the benefits of a covenant not to compete without the employee ever having agreed to one. *E.g., Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 148 F. Supp. 2d 1326, 1337 (S.D. Fla. 2001); *Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d 277, 291-92 (Cal. App. 2002) (collecting authorities accepting and rejecting theory). Notwithstanding such criticisms, *Ackerman* indicates that Indiana courts may entertain attempts to use the inevitable disclosure theory, but that the theory should remain limited to a rare and narrow set of circumstances in which the departing employee has acted in bad faith in taking or threatening to take valuable confidential information from the employer. That is not the case here.

EJP's theory here is that Dearborn must surely remember valuable information about the discounts (called "multipliers" in this industry) that EJP

receives from its suppliers and that it gives to its own customers, as well as information about specific customers, such as who the contact people are, how quickly the customer pays its bills, and the like.  See *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d at 183-84, 190.  Under EJP's theory, the distribution of these pipes, valves, and hydrants is saturated with so much confidential information that no sales representative would ever be able to leave one competitor to join another because he would inevitably use valuable proprietary information to compete for business.

On this record, the more credible evidence from Dearborn and Tom Fieweger of Ferguson Enterprises shows that the discount or multiplier information can change quickly in response to market conditions and negotiations in particular transactions.  In the absence of such market pressures, differential discounts from manufacturers to competing distributors would raise serious problems under the Robinson-Patman Act, 15 U.S.C. § 13(a).  Information about customers is not confidential in this business.  The constructions jobs are publicly known.  The customers are easy to identify and have an interest in allowing competition for their business.  Customers are free to share the prices offered by one distributor with its competitors (accurately or not) to see if they can offer a better price.  Many of the customers are public entities that may not keep their own information secret.  Competition is certainly fierce, as Judge Woodcock noted in *Ross*, 383 F. Supp. 2d at 183, but as he also noted, prices are constantly subject to negotiation based on a host of factors.  *Id.*

Dearborn has learned a great deal about the water, sewer, and drain business over the past 10 years with EJP.  He will be able to draw on the general experience in deciding how best to compete for business on behalf of Ferguson.  See *Donahue v. Permacel Tape Corp.*, 127 N.E.2d at 240-41 (employee may take skill, knowledge, information and education with him, apart from trade secrets and confidential information), citing *Roy v. Bolduc*, 34 A.2d 479, 480 (Me. 1943).[6]  The court is not persuaded that he will inevitably use EJP's confidential or proprietary information against EJP to gain an unfair advantage in competing for business.  Dearborn has acted in good faith; there is no evidence indicating he intends to misappropriate trade secrets or other confidential or proprietary information.  Accordingly, EJP has not shown it is reasonably likely to prevail in its effort to enforce the covenant not to disclose.

*Conclusion*

EJP has not shown a reasonable likelihood of success on the merits of its underlying case. Public policy considerations demand that Indiana law govern the non-competition agreement between EJP and Dearborn.  Unreasonably broad non-compete covenants such as the ones at issue here are unenforceable under Indiana law.  EJP's request for injunctive relief is therefore denied.

---

[6]In light of the choice of law issue, it is interesting to note that *Donahue*, the first modern Indiana case on covenants not to compete, cited this Maine authority for the general principles.  The *Roy* case was decided long before Maine adopted the rule that produced the conflict in this case, focusing on the scope of a covenant not as written but only as the employer seeks to enforce it in court.

So ordered.

Date: April 30, 2007

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Danny E. Glass
FINE & HATFIELD
deg@fine-hatfield.com

Emily Claire Paavola
BAKER & DANIELS
emily.paavola@bakerd.com

Brent D. Taylor
BAKER & DANIELS
bdtaylor@bakerd.com